UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

OREGON NERVE CENTER, LLC, an
Oregon limited liability company, and
JOSE L. OCHOA, M.D.,

       Plaintiffs,

       v.

LAWLOR WINSTON, LLP, a Florida
limited liability partnership,

       Defendant.

Case No.: 3:11-cv-01433-HA

OPINION AND ORDER

---

HAGGERTY, District Judge:

       Plaintiffs, Oregon Nerve Center, LLC, and Jose L. Ochoa, M.D. ("Ochoa") filed a single

tort claim against defendant, a Florida-based law firm, for intentional interference with economic

relations. Defendant seeks summary judgment on plaintiffs' sole claim on several grounds,

including lack of personal jurisdiction and plaintiffs' inability to establish the elements of their

claim. The court held oral argument on defendant's motion on January 31, 2013, and then took

the matter under advisement. For the following reasons, defendant's Motion for Summary

Judgment [64] is GRANTED.


1 - OPINION AND ORDER

## STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is improper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). Once the moving party meets its burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine dispute for trial. *Id.* at 248-49. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (citations omitted).

The court must view the evidence submitted on summary judgment in the light most favorable to the non-moving party. *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 824-25 (9th Cir. 2011). All reasonable doubt as to the existence of a genuine factual dispute should be resolved against the moving party. *MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005) (citation omitted).

## BACKGROUND

The following facts are taken from the parties' declarations and exhibits. They are undisputed unless otherwise noted and are stated in the light most favorable to plaintiffs, the non-moving party.

1.    **The parties**

Ochoa is a neurologist with a national and international reputation regarding complex regional pain syndrome (CRPS), which is sometimes referred to as reflex sympathetic dystrophy (RSD). He is the sole owner and manager of the Oregon Nerve Center, LLC, based in Portland, Oregon. Ochoa's professional activities include clinical practice, scientific research, teaching, and medico-legal consulting services. The majority of his medical practice revenue is derived from work as an expert medical consultant in personal injury cases. Ochoa is widely consulted as an expert—primarily for the defense—regarding personal injury claimants with RSD/CRPS. Since the mid-1990s, he has been retained to provide a medical opinion or independent medical examination (IME) over 1,000 times, has been deposed at least 100 times, and has testified in approximately three dozen trials. In the last fifteen years, he has never diagnosed RSD/CRPS in a patient who was referred to him for an IME.

Ochoa is a well-known, outspoken critic of certain personal injury plaintiffs claiming RSD/CRPS. After performing IMEs on these claimants, Ochoa has described some of them as "sociopaths" or "fraudulent malingerers." He has stated that he believes they were motivated by secondary gain through litigation, and were capable of fabricating symptoms. He has described some personal injury attorneys who represent these claimants as "dishonest," "desperate," or "loser[s]." He believes that RSD is no longer recognized as a diagnosis by the American Academy of Neurology, and is highly critical of pain management doctors who diagnose CRPS. Ochoa has referred to these pain specialists as "amateurs." He has stated that he believes these doctors "make a living by treating imaginary chronic pain" and perform "unnecessary invasive procedures." Ochoa's opinions about RSD/CRPS have been discussed in at least four judicial or

administrative opinions. *See Ernst v. Taylor*, 17 So. 3d 981, 987-88 (La. Ct. App. 2009) (holding

that the trial court should have excluded Ochoa's testimony because he offered no scientific

support for his conclusion that RSD was no longer a valid diagnosis); *Simms v. Mont. Eighteenth*

*Judicial Dist. Court*, 68 P.3d 678, 680-85 (Mont. 2003) (holding that a plaintiff was not required

to travel to Oregon from Montana for an invasive IME, and referring to Ochoa as a neurology

specialist "who is known throughout the medical community for his unorthodox views on

CRPS"); *Claimant v. Liberty Mutual Fire Ins. Co.*, No. IC 99-502709, 2003 WL 1092570, *10

(Id. Indus. Comm'n Feb. 28, 2003) (concluding that Ochoa's opinions had "minimal persuasive

value" because he contradicted himself and selectively used information from the medical

record); *In re Comp. of Galvin*, WCB Case No. 04-08055, 2006 WL 851691, *3 (Or. Work.

Comp. Bd. Mar. 31, 2006) (finding another physician's opinion that a patient had CRPS more

persuasive than Ochoa's opinion that the patient suffered from a pseudoneurological pain

disorder).

   2.    **The underlying personal injury case**

   In 2009, a Florida-based defense law firm hired Ochoa to perform an IME on a personal

injury plaintiff ("Judy") that had sued the firm's client. Judy alleged that she suffered chronic

pain and disability from RSD/CRPS resulting from a fall in front of a retail store. Defendant in

this matter represented Judy in the prior action.

   Ochoa conducted an IME of Judy on July 24, 2009 in Hollywood, Florida. Judy attended

the examination with her husband. An independent court reporter and videographer were also

present to record the IME. Ochoa knew that the IME was being videotaped. The entire

examination lasted over one hour.

4 - OPINION AND ORDER

At some point thereafter, the parties in the case attended a mediation. In preparation for the mediation, defendant allegedly parsed out a forty-seven second clip from the IME to show the mediator and created a PowerPoint presentation setting out Judy's liability position. The case was eventually settled for an undisclosed amount.

### 3.    The video and PowerPoint at issue

In the summer or fall of 2009, defendant retained a "social media consultant" who set up firm accounts with social media outlets, including Facebook, Twitter, and YouTube. Kelley Decl. at Ex. E, p. 2-3. On September 21, 2009, defendant uploaded the forty-seven second clip of Ochoa's IME onto its newly-opened YouTube account. *Id.* at p. 4-5. Defendant contends that the YouTube "metatags" used to identify the subject of the video only referenced Broward County, Florida. *Id.* at p. 11. However, it appears that the video's "tags" also included the term "Jose L. Ochoa." Kelley Decl. at Ex. F, p. 1; Grenley Decl. at Ex. 3.

In the video, Ochoa asks the patient if he can touch her hands. Kelley Decl. at Ex. D, p. 2. She replies that he can touch her right hand, but not her left hand. *Id.* Ochoa then asks her to turn over her hands, and Ochoa quickly blows on her left hand. *Id.* The patient tells Ochoa: "Hey. You know, you're not trustworthy." *Id.* Ochoa says "forgive me," and explains that he blew away a pubic hair from the patient's fingers. *Id.* The patient then ends the examination, says that she is insulted, and then tells Ochoa that "I have never met anybody like you in my life." *Id.*

Andrew Winston, a partner at the defendant law firm, testified that he posted the video for marketing purposes. Kelley Decl. at Ex. E, p. 2. Winston explained that his consultant advised him that the firm's YouTube channel needed content, and the IME clip was the only short

video excerpt that he had at the time that would be suitable for marketing. *Id.* at p. 5-6. The video clip had already been edited for use at mediation. *Id.* at p. 7. Defendant contends that it selected this video clip to demonstrate that videotaping a defense expert's IME can be a powerful litigation tool that some attorneys do not utilize. *Id.* at p. 4-6. Defendant claims that it had no intent to harm Ochoa or his practice. *Id.* at p. 8. Rather, defendant contends that it was seeking clients with RSD/CRPS or referrals from other attorneys who wanted assistance with their own RSD/CRPS cases. *Id.* at p. 9.

On November 20, 2009, Ochoa received an email from Harold Smith Jr., Ph. D., providing that Smith and Ochoa were both defense experts in a Florida case, and that he wanted to communicate with Ochoa privately about a "separate issue." Kelley Decl. at Ex. F, p. 5. After Ochoa confirmed his e-mail address, Smith informed Ochoa on November 23, 2009 that he had received a link from one of his colleagues to a YouTube video that showed Ochoa performing an IME. Kelley Decl. at Ex. F, p. 4. Smith gave Ochoa his impressions of the video and also provided the link so that Ochoa could view it himself. *Id.* Ochoa personally viewed the video on November 23 or 24, 2009. Kelley Decl. at Ex. B, p. 23. He then sent a copy of the link and his intended response to a colleague on November 25, 2009. Kelley Decl. at Ex. G.

Ochoa considered a lawsuit at that time, but decided to "take the high road" or "let the dogs bark." Kelley Decl. at Ex. B, p. 5. Ochoa did not believe that the video had caused him any damage at this point, and he believed that commencing litigation with a law firm would likely be expensive and distracting from his medical practice. Ochoa Decl. at 2. So he did nothing in response to the video clip at that time. Kelley Decl. at Ex. B, p. 6-7.

6 - OPINION AND ORDER

On December 5, 2009, defendant uploaded the PowerPoint presentation that it had used during the mediation to its YouTube channel. Kelley Decl. at Ex. E, p. 7. Defendant contends that the PowerPoint was used in the mediation to demonstrate how defendant was prepared to attack Ochoa's opinions. *Id.*, p. 12. The PowerPoint video referenced defendant's name and "RSD" in its description and tags, but not Ochoa's name. *Id.*, p. 13.

The PowerPoint includes photographs and factual information about the Florida personal injury case, medical information about Judy, jury instructions, a diagram explaining RSD/CRPS, and summaries of Judy's damages. Kelley Decl. at Ex. A. Near the end of the PowerPoint presentation, defendant included quotes from one of Ochoa's depositions dated May 19, 2008. *Id.* The PowerPoint slide provided that Ochoa has "seen a thousand case[s]" involving RSD/CRPS and never agreed with that diagnosis. *Id.* at 31. One of the slides provided a quote from *Ernst* that stated:

> Dr. Ochoa could not offer any medical evidence, other than his own personal studies, for his theories that RSD was no longer a viable diagnosis. . . . Dr. Ochoa admitted that there were many medical books that recognized that RSD, or CRPS, is a disabling condition. There was no evidence or testimony offered to indicate that Dr. Ochoa's conclusion is reliable or scientifically based. . . .

*Id.* at 33.

The PowerPoint also provided that from 1997-2009, Ochoa earned "$3.6 million- 4.8 million . . . denying that RSD/CRPS exists." *Id.* at 37. Another slide stated that Ochoa had been paid $20,500 to date in the Florida action, retained in approximately 1,000 cases, and "thus, Dr. Jose Ochoa has made approximately $20,500,000 for denying that RSD/CRPS exists." *Id.* at 38. The PowerPoint concluded with screen shot of the IME video. *Id.* at 39.

7 - OPINION AND ORDER

In April of 2011, Maria Pilar Landver, Ochoa's daughter and assistant office manager, discovered the video clip by using search terms including "Ochoa" in Google's online search engine. Landver Decl. at 1. At this time, the IME video had been viewed 876 times. Landver Decl. at 2; Grenley Decl. at Ex. 3. Landver contacted YouTube to request that it remove the video. Landver Decl. at 2. YouTube complied, and removed the video by April 12, 2011. *Id.*; Grenley Decl. at Ex. 4.

Landver conducted a similar search on Google and YouTube with the term "Ochoa" in May of 2011, and discovered that the original IME video had been re-posted with additional commentary. Landver Decl. at 2. The re-posted video had been viewed 102 times by May 23, 2011. Grenley Decl. at Ex. 5. She also discovered the PowerPoint presentation for the first time. Landver Decl. at 2. The re-posted video included Ochoa's name in the title, description, and tags. Grenley Decl. at Ex. 5. The description also provided: "One can only speculate as to how Dr. Ochoa feels about having his conduct during this examine [sic] out in the *pubic* view . . ." *Id.* (emphasis added). The use of the word "pubic" was intentional, and Winston considered it to be a joke or satire based on the content. Grenley Decl. at Ex. 14, p. 17. Landver again asked YouTube to remove the videos, but YouTube denied the request, finding no violation of its privacy guidelines. Landver Decl. at 2; Grenley Decl. at Ex. 6.

At this point, Ochoa became concerned that these videos might affect his business. Ochoa Decl. at 2. In mid-2011, Ochoa asked his staff to check his financial records to see if his forensic medical practice business had diminished. *Id.* His staff confirmed that his referrals had significantly declined in early 2011. *Id.*; Landver Decl. at 2. Ochoa reviewed his records, including his tax returns, for the years 2002 through 2011, and found that his forensic medical

revenues decreased approximately sixty-five percent in 2011. Ochoa Decl. at 2 (noting an average revenue of $600,000 per year in 2002-2010, and $193,115 in 2011). He also attended only six depositions and one trial from July 2009 through October 2012, which was far less than his rate for these activities in the previous eighteen years. *Id.*

Ochoa believes that defendant's sole purpose in posting the IME video was to denigrate and harm his reputation because, in his opinion, the video did not benefit the patient or serve any scientific purpose. Kelley Decl. at Ex. B, p. 2-3. Ochoa agrees that the video accurately portrays what happened during the IME. *Id.* at p. 4. However, he believes that the video is misleading because it shows only a small portion of the IME. *Id.* Ochoa also believes that the quotations in the PowerPoint were taken out of context and did not include an explanation, so they improperly implied that Ochoa's opinions are unreliable and not scientifically based. *Id.* at p. 8-9. He contends that the statement that he made approximately $20.5 million denying that RSD/CRPS exists is a misrepresentation. *Id.* at p. 15.

Plaintiffs filed their original Complaint in this case on November 28, 2011. Following the court's ruling on defendant's Motion to Dismiss, Ochoa filed an Amended Complaint on September 18, 2012.

## DISCUSSION

Defendant seeks summary judgment on plaintiffs' sole claim for intentional interference with economic relations (IIER) based on (1) lack of personal jurisdiction, (2) the statute of limitations, (3) plaintiffs' failure to establish all of the elements of its claim, and (4) that punitive damages are not recoverable on plaintiffs' tort claim as a matter of law. Defendant also raises hearsay objections in its reply brief to Exhibit 12 attached to the Grenley Declaration, Exhibit J

to the Kelley Declaration, and aspects of Ochoa's deposition. Defendant's evidentiary objections are discussed first.

### 1.    Hearsay

The evidence at issue includes two letters to Ochoa and Ochoa's deposition testimony. Defendant asserts that the evidence is hearsay not subject to any exception. Plaintiffs contend that the evidence is not hearsay, but even if it is, they would be able to present the challenged evidence in an admissible form at trial.

As a general rule, evidence presented in support of or in opposition to a motion for summary judgment must be relevant, based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. Fed. R. Civ. P. 56(c); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). Hearsay is defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is generally inadmissible unless it constitutes non-hearsay or falls within one of the hearsay exceptions under the federal rules. *Orr*, 285 F.3d at 778.

Exhibit J is a letter from Anthony Gaspich, a Seattle-based lawyer who retained Ochoa as an expert in another matter, to Ochoa regarding a billing dispute. Defendant seems to object to Gaspich's statement: "You are aware of a well circulated video on the internet of a patient examination that you performed in which you explain the reason for blowing on a woman's hand as having to do with removing a pubic hair." Kelley Decl. at Ex. J, p. 3. Plaintiffs contend that

the letter is only offered to prove that the statement was made, and that the court can infer from the statement that Gaspich viewed or was otherwise aware of the video.

Defendant originally submitted Exhibit J as part of its motion, and contends that it offered the letter to show alternative reasons why Ochoa may have suffered damages, not for the truth of the matter asserted. Defendant asks that this court restrict the evidence to defendant's limited purpose and not allow plaintiffs to rely on it to oppose summary judgment. *See* Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose--but not against another party or for another purpose--the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). This court declines to limit the use of defendant's evidence.

In its opening brief, defendant explained that Exhibit J demonstrated why an attorney believed calling Ochoa as an expert witness "could have been problematic and risky." Def.'s Mem. at 18. One of the purported reasons for questioning Ochoa's credibility included the attorney's alleged viewing of the IME video, which defendant acknowledged in its brief and did not limit in any way. Accordingly, the court finds that by offering the exhibit itself, defendant has waived its right to object to the admissibility of that evidence. *A.A.B. Joint Venture v. United States*, 77 Fed. Cl. 702, 706 (2007); *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005); *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998); 10A Charles Alan Wright et al., Federal Practice & Procedure § 2722 (3d ed. 2011)).

Defendant also objects to the deposition excerpts cited in the causation section of plaintiffs' responsive brief. Pls.' Resp. at 23-24 (citing Ochoa Dep. at 102:20- 103:13; 104:7-

11 - OPINION AND ORDER

106:1; 155:5-156:10; 165:24-166:5; 170:12-171:16). In those excerpts, Ochoa refers to the

matter in Washington discussed in Exhibit J in which he performed an IME on the patient

(Sanchez) and prepared for his deposition, but the deposition was cancelled. Ochoa Dep. at

104:7-106:1. Ochoa believed that the attorney's viewing of the video affected his claimed fees in

the Sanchez case, resulting in an underpayment of approximately $9,000. *Id.* at 155:5-156:10;

170:12-16. Additionally, Ochoa discusses a woman (Prater) in a case from Alaska who allegedly

cancelled her IME with Ochoa after she viewed the video. *Id.* at 165:24-166:5. Ochoa testified

that he believed he lost approximately $2,000 in the Prater case. *Id.* at 170:19-171:1. Defendant

also objects to an e-mail from Ochoa to a colleague requesting that she conduct an IME of Prater

who purportedly refused to be seen by Ochoa because of the video. Grenley Decl. at Ex. 12.

After reviewing the challenged evidence, this court declines to strike it. Although the

form of the evidence is largely inadmissible, the contents could be presented in admissible form

at trial through the declarants' direct testimony. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th

Cir.2003) (holding that evidence presented on summary judgment need only contain evidence

that could be admitted at trial in an admissible form). Therefore, plaintiffs' causation evidence is

considered in this ruling's analysis.

### 2.    Personal Jurisdiction

Specific personal jurisdiction over a non-resident defendant requires (1) that the

non-resident purposefully direct its activities at the forum or perform some act by which it

purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking

the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to

the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable.

*Fiore v. Walden*, 688 F.3d 558, 573-74 (9th Cir. 2012) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).  The parties agree that the facts of this case must be analyzed under the *Calder* effects test derived from *Calder v. Jones*, 465 U.S. 783, 788–90 (1984).  Under this test, a plaintiff may establish purposeful direction by showing that the non-resident defendant committed an intentional act, expressly aimed at the forum state, that caused harm that the defendant knew would likely be suffered in the forum state.  *Fiore*, 688 F.3d at 576.  Thus, "where there was 'individual targeting' of forum residents—actions taken outside the forum state for the purpose of affecting a particular forum resident or a person with strong forum connections—[the courts] have held the express aiming requirement satisfied." *Id.* at 577 (citations omitted).

This court previously rejected defendant's jurisdictional arguments in its ruling on defendant's Motion to Dismiss.  *See* Opinion and Order [18].  Defendant now asserts that the record establishes that its acts of posting the video and PowerPoint were only intended to target the local Broward County area to market its success in RSD/CRPS cases.  However, notwithstanding Winston's self-serving testimony that he posted the video solely for local marketing purposes, the record does not provide a basis to change the court's prior ruling regarding jurisdiction.  Neither the IME video nor the PowerPoint contained any marketing statements about defendant's firm apart from the defendant's website.  Also, contrary to Winston's testimony, none of the tags for the IME video referenced Florida, Broward County, or the towns in Broward County.  *See* Grenley Decl. at Ex. 3 & 5 (showing Ochoa's name in the title, description, and tags for the video, but no geographic tags).  Instead, the record establishes that defendant intentionally posted a video of Ochoa which referenced his name, knowing that

13 - OPINION AND ORDER

(1) he was one of the predominant defense experts in RSD/CRPS cases; (2) he is retained across the country in that capacity; and (3) he lived and worked in Oregon.[1] Based on the evidence, this court concludes that defendant's act of posting the video was performed with the purpose of having its consequences felt by plaintiffs in Oregon. As discussed in my previous order, and not challenged by the parties, this court again finds that to the extent plaintiffs suffered any harm, such harm would necessarily be felt in Oregon; plaintiffs' claim arises out of defendant's forum-related activities; and the exercise of jurisdiction is reasonable in this case. Defendant's motion for summary judgment is therefore denied on this issue.

### 3.      Statute of limitations regarding the initial posting of the IME video

Plaintiffs filed this action on November 28, 2011. Because the tort of IIER is governed by the two year statute of limitations in Oregon Revised Statute 12.110(1), defendant contends that it is entitled to partial summary judgment as to the initial posting of the video on November 23, 2009. *See Daven v. George Fox Univ.*, No. CV 09-305-PK, 2010 WL 1424330, *5 (D. Or. Jan. 29, 2010) (noting that IIER claims must be filed within two years). The two year statute of limitations accrues once the interference "in fact causes injury." *Butcher v. McClain*, 260 P.3d

---

[1] Defendant disputes that it knew Ochoa's medical practice was based in Oregon at the time Winston posted the video, and contends that it never anticipated that the video would be viewed in Oregon. Defendant's self-serving statement is insufficient to obtain summary judgment on this issue and is viewed with some skepticism. In the description section of the video, defendant indicates that Ochoa's opinions were stricken or disallowed in at least three states. Of the four cases to which defendant could be referring, several indicate that Ochoa's practice is based in Oregon. *See Ernst*, 17 So. 3d at 988 (noting that Ochoa is presently associated with two hospitals in Portland, Oregon, and has been in Oregon for twenty-one years); *Simms*, 68 P.3d at 680 (noting that Ochoa is a neurology specialist based in Portland, Oregon at the Oregon Nerve Center); *Claimant v. Liberty Mutual Fire Ins. Co.*, 2003 WL 1092570 at *7 (noting that the claimant's IME was performed by Ochoa in Portland, Oregon).

611, 615 (Or. Ct. App. 2011) (citing *Cramer v. Stonebridge Inn, Inc.*, 713 P.2d 645, 647 (Or. Ct. App. 1986)).

The question in this case is when the injury occurred. As the Oregon Court of Appeals held in *Cramer*, a claim for IIER requires damage beyond the interference itself, so the claim does not accrue until the interfering act causes harm to the plaintiff. *Cramer*, 713 P.2d at 647 (holding that lien holders' claim accrued at the time of the foreclosure sale, when their lien became worthless because other trust deeds gave them lower lien priority, rather than at the time of the recording); *see also Butcher*, 260 P.3d at 615 (holding that an IIER claim based on loss of prospective inheritance accrued at the time of the testator's death—when the plaintiffs lost their expected inheritance—even though the alleged interference (execution of the will disinheriting the plaintiffs) occurred more than two years before the suit was filed). However, where it is clear that a harm has occurred, the full extent of damages need not be determined for the limitations period to commence. *Jaquith v. Ferris*, 687 P.2d 1083, 1085-86 (Or. 1984) ("[I]t is immaterial that the extent of damages could not be determined at the time of the [tort] for purposes of determining when the statute of limitation commenced to run.").

The record shows that Ochoa received notice of the video by Dr. Smith on November 23, 2009, and that Smith encouraged Ochoa to remove the video because "it will be used against you in other proceedings" and is "clearly . . . an effort to discredit you." Kelley Decl. at Ex F, p. 1-2. Ochoa personally viewed the video at least by November 24, 2009. The record indicates that Ochoa was concerned by the video as soon as he saw it. On November 25, 2009, Ochoa sent a colleague a comment he prepared in response to the video in which he stated that he believed the video was "fraud" and "slander," and explained that he was planning a lawsuit against defendant.

Kelley Decl. at Ex. G; *see* Ochoa Decl. at 1-2 (conceding that he considered a lawsuit against defendant at that time). Although Ochoa ultimately decided to "let the dogs bark" and simply ignored the video, he was aware that he had been injured by the video by at least November 25, 2009. Plaintiffs' arguments regarding when Ochoa discovered that his business was declining in mid-2011 go to the extent of his damages, not the initial discovery of the harm. Ochoa knew that he was injured by the video by November 25, 2009, so any purported damages relating to the initial posting of the video are time barred. Defendant's motion for partial summary judgment as to the initial IME video is granted. Plaintiffs' claim arising from the PowerPoint and the re-posting of the video is not barred by the statute of limitations.

### 4.   Merits of tort claim

To establish their sole claim for IIER, plaintiffs must prove (1) the existence of a professional or business relationship; (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages. *Allen v. Hall*, 974 P.2d 199, 202 (Or. 1999). Defendant contends that plaintiffs cannot prove the second, fourth, fifth, and sixth elements of their claim. Because this court agrees that plaintiffs have failed to present any evidence of causation, defendant is entitled to summary judgment.

### A.   Intentional interference

To be liable, the person whose actions interfere with another's business relations must have the intent to cause the result, or must at least know that the interference is a necessary

consequence from his actions and is substantially certain to occur. *Straube v. Larson*, 600 P.2d 371, 374 (Or. 1979).

Defendant has submitted evidence showing that its only intent in posting the video was marketing in the Broward County area. For the reasons already discussed, defendant's testimony about its business purposes is viewed with skepticism and presents a triable question. The evidence shows that defendant intentionally posted the video and PowerPoint presentation on the internet which identified Ochoa by name, showed a patient calling Ochoa "untrustworthy," and referred to his opinions being excluded as unreliable in several cases. Defendant also added commentary to its video in May 2011 that read: "One can only speculate as to how Dr. Ochoa feels about having his conduct during this examine [sic] out in the pubic view . . ." Grenley Decl. at Ex. 5. A reasonable factfinder could draw the inference that defendant knew the video would negatively affect Ochoa's business or reputation once it was made public. Accordingly, the evidence raises a genuine factual question regarding whether defendant acted with an intent to interfere with plaintiffs' business, or would have known that interference was substantially certain to occur.

### B.    Improper means or improper purpose

A plaintiff must also only prove that the defendant had a duty of non-interference, that is, the defendant interfered with the plaintiff's business relations for an improper purpose rather than for a legitimate one, or that the defendant used improper means which resulted in injury to the plaintiff. *Straube*, 600 P.2d at 374. Therefore, the plaintiff's case may go to a jury only "when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Id.* (citation omitted).

If liability is to be based on an actor's purpose, then "the purpose must be to inflict injury on the plaintiff as such." *Nw. Natural Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1124 (Or. 1999) (citation and internal quotation omitted). If liability is instead based on an actor's means, then "the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Id.* (citation omitted). Improper means include threats or other intimidation, misrepresentations, defamation, or disparaging falsehoods. *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 n.11 (Or. 1978) (citation omitted). "Generally, a defendant's subjective judgment as to its own business purposes will control." *Nw. Natural Gas Co.*, 982 P.2d at 1124 (citation omitted).

Plaintiffs cite defamation and false light as the improper means used by defendant. To prove improper means, plaintiffs are not required to prove all the elements of defamation and false light, so long as those elements that pertain to defendant's tortious interference are present. *Top Service Body Shop, Inc.*, 582 P.2d at 1371 n.11.

"A defamatory communication is one that would subject another to hatred, contempt or ridicule [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]." *Volm v. Legacy Health System, Inc.*, 237 F. Supp. 2d 1166, 1177-78 (D. Or. 2002) (citing *Reesman v. Highfill*, 965 P.2d 1030, 1034 (Or. 1998)). In the professional context, a statement is defamatory if it is false and "ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, [or] profession." *Brown v. Gatti*, 145 P.3d 130, 133 (Or. 2006). The defamatory words must "cast aspersions on the

18 - OPINION AND ORDER

plaintiff's ability to perform essential functions, or must assert that the plaintiff lacks a characteristic necessary to successful performance, of his or her job." *Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Starplex Corp.*, 188 P.3d 332, 347 (Or. Ct. App. 2008) (citations omitted).

Even if a statement is not defamatory on its face, it may be defamatory if a reasonable person could draw a defamatory inference from it. *Volm,* 237 F. Supp. 2d at 1178. The court must determine how a reasonable person would understand the allegedly defamatory statement by looking at the general intent of the document and not to isolated sentences. *Brown,* 145 P.3d at 133-34. The inquiry asks whether the natural and proximate consequence was to injure the person discussed, or whether the words chosen "tend to bring a person into public hatred, contempt or ridicule." *Id.*

Plaintiffs primarily take issue with the allegedly defamatory statement in the PowerPoint presentation that Ochoa "has made approximately $20,500,000 for denying that RSD/CRPS exists." Plaintiffs assert that the statement improperly implies that Ochoa's medical opinions are based on financial incentive rather than science. Defendant contends that the information is truthful, and explains that it calculated the financial figure ($20.5 million) by multiplying the amount Ochoa had been paid in the Florida case ($20,500), by the number of cases in which he had been retained (1,000). It also points to Ochoa's history of testifying that RSD is no longer a valid diagnosis, and the fact that he has never diagnosed a patient with RSD or CRPS.

When viewing the evidence in plaintiffs' favor, a reasonable factfinder could conclude that Ochoa is a well-educated neurologist who has examined over 1,000 patients during IMEs, and then independently concluded, based on his background, research, and examinations, that those patients did not suffer from RSD/CRPS. Therefore, when reviewing the PowerPoint as a

whole, defendant's statement creates a reasonable defamatory inference that Ochoa is a "hired

gun" who was paid specifically to deny the existence of RSD/CRPS without any medical

independence.

The nine slides about Ochoa compare other physicians' medical findings about the Florida

plaintiff with Ochoa's findings, which is then juxtaposed with Ochoa's deposition excerpts from

other cases, a quotation from *Ernst* stating Ochoa's opinions were not "reliable or scientifically

based," and the statement that Ochoa made over $20 million denying the existence of

RSD/CRPS.  This creates a defamatory inference that Ochoa's opinions are generally unreliable

and for sale, and could be reasonably interpreted as an improper attempt to discredit him and

damage his medical reputation.  Moreover, defendant's animus toward Ochoa is well documented

in the record through such statements as "Ochoa is a misogynistic, lying whore," and that it

would be defendant's "pleasure to help anyone kick that guy in the teeth."  Grenley Decl. at Exs.

9-10.  Plaintiffs must acknowledge, however, that the Montana Supreme Court has referred to

Ochoa as a "hired gun" who has "become well known and sought out in the legal community as a

doctor for hire to refute CRPS claims." *Simms*, 68 P.3d at 680.  Therefore, when viewing the

evidence in a light most favorable to plaintiffs, this court believes that at least a factual dispute

exists as to the truth of defendant's statement to determine whether defendant's acted with

improper means or an improper purpose.

### C.    Causation and damages

The fifth element "requires a causal nexus between the interference and the damage to the

relationship." *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1190 (D. Or. 2011)

(quoting *Douglas Med. Ctr. v. Mercy Med. Ctr.*, 125 P.3d 1281, 1289 (Or. Ct. App. 2006)).

20 - OPINION AND ORDER

Causation can be established if the defendant's conduct causes a third party to terminate a contract with the plaintiff, or induces a third party from entering into a business relationship with the plaintiff. *Thompson v. Telephone & Data Sys., Inc.*, 881 P.2d 819, 826 n.1 (Or. Ct. App. 1994). The injury requirement may be satisfied by proof that the defendant actually caused a third party to breach its contract with the plaintiff, or by proof that "defendant's wrongful actions have rendered plaintiff's obligations more onerous or prevented plaintiff from realizing the full benefit of his contract with a third party." *Banaitis v. Mitsubishi Bank, Ltd.*, 879 P.2d 1288, 1296 (Or. Ct. App. 1994) (citations omitted).

To avoid summary judgment, the record must contain evidence that would allow an objectively reasonable factfinder to conclude that defendant's act of posting the video caused third parties to not seek Ochoa's services or in some way prevented Ochoa from realizing the full benefit of a prior contract. Plaintiffs have presented Ochoa's declaration stating that plaintiffs' business revenue sharply decreased in 2011, but have been unable to put forth any evidence that the lost business was caused by defendant's conduct. Even when this court considers the hearsay evidence submitted by plaintiffs, the record indicates that patient Prater allegedly made her decision to not follow through with her IME with Ochoa before the video was re-posted in May of 2011. Plaintiffs have not presented any evidence that Prater ever viewed or was aware of the PowerPoint presentation. Attorney Gaspich's letter stating that he believed Ochoa had charged excessive fees also occurred before the IME video was re-posted, and does not provide any indication that he was aware of the PowerPoint.

Plaintiffs' theory would require a jury to speculate that because the record shows that some people viewed the video or PowerPoint in 2011, and plaintiffs' business revenue declined

during that time, the two events must be related.  Mere speculation in the absence of evidence

regarding causation is insufficient to survive summary judgment.  *Servs. Emps. Int'l v. Portland*

*Habilitation Ctr., Inc.*, 173 P.3d 1268, 1270 (Or. Ct. App. 2007).  Moreover, such a finding may

not be reasonable based on the plethora of critical statements about Ochoa's controversial

opinions about RSD/CRPS in cases like *Ernst* and *Simms*.  Accordingly, the court concludes that

no objectively reasonable juror could find that defendant's actions of posting the PowerPoint

presentation and re-posting the IME video in May of 2011 caused third parties to not hire or

continue business relationships with plaintiffs.  Because plaintiff's sole claim fails as a matter of

law, the court need not address the request for punitive damages.

## CONCLUSION

For the reasons provided, defendant's Motion for Summary Judgment [64] is GRANTED.

This matter is dismissed with prejudice.

IT IS SO ORDERED.

DATED this _7_ day of February, 2013.

Ancer L. Haggerty
United States District Judge

22 - OPINION AND ORDER